Jonathan M. Baum (CA SBN 303469)
Joy Holden* (DC SBN 90021283)
**HWG LLP**
1919 M St. NW, 8th Floor
Washington, DC 20036
Telephone: (202) 730-1300 / Facsimile: (202) 730-1301
*jbaum@hwglaw.com*
*jholden@hwglaw.com*

Attorneys for Defendant
CARL FERRER

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

United States of America,

Plaintiff,

v.

Carl Allen Ferrer,

Defendant.

CASE NO. 2:18-CR-464-DJH

**DEFENDANT CARL FERRER'S SENTENCING MEMORANDUM**

Sentencing Date: September 9, 2025
Time: 9:00 a.m.

Before the Honorable
United States District Judge Humetewa

## INTRODUCTION

Carl Ferrer is the person most responsible for the shutdown of the world's largest online brothel, Backpage.com (hereafter "Backpage" or the "Company"). Before Mr. Ferrer broke with his employers of nearly two decades and became the Government's lead cooperator in this case, Backpage spent more than a decade preparing to make itself invulnerable to all manner of attack from U.S. law enforcement. Every aspect of its business was shielded, from its redundant overseas servers, to its offshore credit card processors, to its global network of cryptocurrency brokers.

Ferrer was the global operation's single greatest point of weakness. Because of his role as the Company's nominal "owner" after the founders engineered the sale of the Company to him in 2015, Ferrer had the formal authority to direct the shutdown of the entire operation and the forfeiture of millions of dollars in Backpage assets. Because of his role as the Company's day-to-day operations manager from 2015–2018, Ferrer was uniquely positioned to provide the location and passwords for Backpage's servers and crypto wallets. And because of his longstanding relationships with Backpage's staff and partners around the world, Ferrer was able to influence critical individuals to join him in cooperating, including Dan Hyer.

[redacted] He directed the takedown of the Backpage website in 99 countries and channeled approximately $215 million from the Company to the U.S. Government to compensate victims.

Ferrer acted despite clear risk of professional and financial harm. Michael Lacey, James Larkin, Scott Spear, and Jed Brunst were the only employers Ferrer had known

since 1996, when he was hired into a mid-level management role as the Dallas Observer's classified advertising manager.

Ferrer's career at Backpage culminated in 2015, when Larkin and Lacey—facing a slew of civil and criminal inquiries—found themselves unable to find any willing buyers for Backpage. Desperate to distance themselves from the Company's toxic image (but unwilling to give up its lucrative profits), the owners asked Ferrer to buy Backpage from them with $600 million they would loan him. The purchase bore none of the hallmarks of a traditional business transaction. Ferrer never paid any money to the sellers at the time of the transaction (because he didn't have any). He never had independent counsel; he was instructed at each step of the process by lawyers for Larkin and Lacey. ECF No. 1834 at 55–57. And Ferrer was prohibited by contract from engaging in the basic formalities in which businesses engage—opening a bank account, hiring a lawyer, changing vendors, or making any significant operational changes—without express approval from Larkin and Lacey.

Despite clear risk, Ferrer has done everything in his power to shut down Backpage. [redacted]

Ferrer assisted the Government in another critical way: shedding light on Backpage's marketing operations, where the Company directly helped to promote prostitution. For more than a decade, critics—including state Attorneys General, a U.S. Senate subcommittee, and dozens of plaintiff's lawyers—had focused on Backpage's content moderation practices, revealing the Company's knowledge that prostitutes used its website. However, because Section 230 of the Communications Act expressly protects companies from civil and state criminal liability for their content moderation

---

[1] [redacted]

practices, prior efforts to hold Backpage fully accountable had fallen short. 47 U.S.C. § 230. For example, the initial indictments of Larkin, Lacey, and Ferrer in California State Court was dismissed in 2016 on grounds that it was inconsistent with Section 230. *People v. Ferrer*, No. 16FE019224, 2016 WL 7237305 (Cal. Dec. 9, 2016).

Ferrer broke this logjam in 2018 by telling prosecutors about the other half of Backpage's business: marketing. Starting in 2005, Backpage channeled millions of dollars to hire employees to actively reach out to known prostitutes to solicit advertisements. The Company's marketing strategy was designed to attract a critical mass of prostitution ads, positioning the website to explode as the premier destination for prostitution ads once Craigslist shuttered its adult section in 2010. The information about marketing provided by Ferrer helped to eviscerate Backpage's primary legal defense—that it was a mere publisher of third-party content—and gave prosecutors the key facts they needed to convict Backpage's founders.

Ferrer's assistance didn't stop there. During the September 2023 trial, Ferrer testified for twelve days and authenticated more than two hundred exhibits. Ferrer walked the jury through the mechanics of the site's referral traffic—explaining how Backpage's increase in revenue stemmed "mostly [from] prostitution revenue," and that much of the site's traffic came through its relationship with escort review sites, including The Erotic Review. ECF No. 1791 at 72:12–14. Ferrer also explained how the Company's executives obsessively measured the website's growth, including using detailed reports from Google Analytics to see that most of the site's traffic was coming from prostitution-related websites. Critically, Ferrer provided the Government with evidence linking the individual defendants to the criminal enterprise. Ferrer explained that Spear was supervisor who oversaw the major decisions. *Id.* at 20:8–9. Ferrer testified that Brunst was a key player in the finances of Backpage, and that Lacey was involved in public relations efforts to silence critics and keep the revenues flowing. Ferrer's testimony led to convictions for Spear, Brunst, and Lacey.

## LEGAL STANDARD

A sentencing court must impose a sentence that takes account of the factors enumerated in 18 U.S.C. § 3553(a). In particular, a court must fashion a sentence that is "sufficient, but not greater than necessary," to serve the purposes of sentencing set forth in the statute. 18 U.S.C. § 3553(a)(2); see Kimbrough v. United States, 522 U.S. 85, 111 (2007). As the Supreme Court has explained, "[t]he overarching statutory charge for a district court is to 'impose a sentence sufficient, but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (citing 18 U.S.C. § 3553(a)).

## ARGUMENT

### I. The 3553(a) Factors Warrant a Downward Departure

*a. Nature and Circumstances of the Offense*

The nature and circumstances of Mr. Ferrer's role in Backpage are fundamentally different from those of Lacey, Spear and Brunst. Ferrer joined the company in 1996 as a mid-level employee in charge of classified ad sales in Dallas. Even though he was described as Backpage "founder," Ferrer was effectively always an employee.[2] Even after the sham "sale" to Ferrer in 2015, he remained a functional employee. He did not have the authority to make operational decisions about Backpage, could not make hiring decisions, and did not share in the profits of Backpage like a true owner. Tr. of Ferrer

---

[2] In 2015, as Backpage was facing mounting pressure, Larkin, Lacey, Spear and Brunst conducted a sham operation to "sell" Backpage to Ferrer. Tr. of Ferrer Trial Test. at 57:12–14, ECF No. 1813, *United States v. Lacey*, No. 18-cr-422-DJH (D. Ariz. Sept. 22, 2023) ("My duties were the same that I had as an employee … and I had to sign an Employment Agreement."). Not a dollar changed hands during this operation, because Ferrer never had the money to buy Backpage.

Trial Test., ECF No. 1838 at 58 ("It's a plan that the sellers put together . . . and I'd be an employee, essentially.").

Because he was a functional employee, Ferrer's level of financial interest in the conspiracy was also lower than the owners. Spear, Brunst, Larkin, and Lacey made millions of dollars during their nearly twenty years as Backpage owners. In total, Larkin made roughly $140 million from 2013–2016, Lacey made roughly $145 million from 2013–2016, Spear made roughly $10.1 million from 2013–2015, and Brunst made roughly $19.8 million from 2013–2015. Tr. of Trial Proceedings at 48:10–16, 50:23–25, 51:1–3, 54:24–25, 55:1–5, 15–20, ECF No. 1290, *United States v. Lacey*, No. 18-cr-422-DJH (D. Ariz. Sept. 4, 2021). In contrast, Mr. Ferrer earned only a small fraction, and has voluntarily forfeited every dollar he made from Backpage as part of his plea agreement.

*b. Avoiding Unwarranted Disparities*

The Court must impose a sentence that avoids unwarranted disparities among similarly situated defendants, 18 U.S.C. § 3553(a)(6) – and, conversely, a sentence that avoids unwarranted similarities among defendants who are different. *See United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006) ("[A] sentencing difference is not a forbidden 'disparity' if it is justified by legitimate considerations."); *United States v. Cabrera*, 567 F. Supp. 2d 271, 273 (D. Mass. 2008) ("False uniformity occurs when we treat equally individuals who are not remotely equal because we permit a single consideration . . . to mask other important factors."). Here, Lacey received a 60-month sentence, despite being a primary owner of Backpage. Spear and Brunst were each sentenced to 120-month terms, despite being convicted of many more offenses and occupying positions of far greater responsibility than Ferrer. Additionally, unlike Lacey, Spear, and Brunst, Ferrer did not seek to evade responsibility for his conduct. Rather, he pled guilty and has spent the last seven years seeking to ensure the takedown of the website, the success of the prosecution's case, and the collection of money to compensate victims.

  *c. The Court Can Independently Consider Ferrer's Extraordinary Cooperation*

Separate from any motion under § 5K1.1, the Court can consider, as part of its overall sentencing calculus, the efforts a defendant made to cooperate, particularly when those efforts yielded a benefit to the government. *See United States v. Fernandez*, 443 F.3d 19, 33 (2d Cir. 2006) (holding that district court can consider, under § 3553(a), a defendant's "efforts to cooperate, even if those efforts did not yield a Government [5K1.1] motion"), abrogated on other grounds by *Rita v. United States*, 551 U.S. 338 (2007); *United States v. Doe*, 398 F.3d 1254, 1261 (10th Cir. 2005) (holding that "a defendant's assistance should be fully considered by a district court at sentencing even if that assistance is not presented to the court in the form of a § 5K1.1 motion"). Here, Mr. Ferrer's extraordinary cooperation itself supports an important role in the Court's sentencing calculus.

*d. General and Specific Deterrence*

The extraordinary history of this case—including Ferrer's critical role in securing the convictions of the owners of Backpage, dismantling the website worldwide, and recouping $215 million for victims—makes clear that the goals of deterrence are not furthered by incarcerating Mr. Ferrer.

There is obviously no need for individualized deterrence as to Mr. Ferrer, who has pled guilty, forfeited every dollar connected to Backpage, and spent the last seven years fighting to ensure justice for victims. Mr. Ferrer's extraordinary cooperation, leading to the shutdown of the website and the conviction of its owners, has also itself done a great deal to provide general deterrence against those who would seek to engage in a similar scheme. Indeed, had. Mr. Ferrer not helped to shut down the website and ensure the government's success in this case, the need for general deterrence would be far greater and it would be much more likely that Backpage or other copycat websites would continue to exist, either in the United States or offshore.

*e. A Sentence of Probation is Sufficient, but Not Greater Than Necessary*

A sentence that does not include imprisonment does not mean that Ferrer will escape punishment. For one, he will forever carry the stigma of a felony conviction. *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (endorsing the district court's view that "the need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment of the defendant"). Here, Ferrer's conviction has been the subject of extraordinary media coverage around the world and will follow him for the rest of his life.

Ferrer's extraordinary history makes it clear he is exceedingly unlikely to recidivate. For the past seven years, Ferrer has worked tirelessly to ensure the shutdown of Backpage. He has also been a model supervisee. Now, at age 64, he has remarried, retired, and spends his days gardening and taking care of his wife and grandchildren. Incarceration would serve no useful purpose and is unnecessary to achieve any legitimate sentencing aim. In contrast, a sentence of probation would punish Ferrer for his office while permitting him to continue his path to rehabilitation.

## II. Ferrer's Exemplary Cooperation Merits a Downward Departure to a Sentence of Probation

[redacted] Ferrer's cooperation falls into three distinct categories: (A) assistance in shutting down the Backpage website and closing the related business in the United States and 98 other countries, (B) assistance in recovering more than $215 million in prostitution-related proceeds for the Government, and (C) assistance in informing the Government about Backpage's prostitution marketing operations, undermining the Defense's claim that Backpage was a mere publisher of third-party advertisements, and directly enabling the convictions of Lacey, Brunst and Spear.

### A. Ferrer Directed the Shutdown of Backpage in 99 Countries

The shutdown of the Backpage website in April 2018 was a herculean undertaking. Prior to Ferrer's agreement to cooperate in April 2018, it would have been virtually impossible. Shortly after learning it was the target of a federal criminal investigation in 2012, Backpage started moving operations offshore and building data centers storing prostitution ads. In 2013, Brunst created a shell company in the Netherlands called Payment Solutions BV. This same year, the Company contracted with a data center in Amsterdam to "mirror" all the website's content. Backpage expressly selected the Netherlands in order to be outside the reach of U.S. law enforcement. ECF No. 1813 at 80:23–25, 81:1–9.

Ferrer gave the Government everything it needed to swiftly shut down the website. 

[redacted]

Lastly, Ferrer assisted the Government in forfeiting the domain name www.backpage.com, as well as 263 other domains that the Company owned for related websites in the U.S. and around the world. Backpage had registered these domain names in Europe in order to safeguard them from seizure by U.S. authorities. Ferrer provided the credentials for agents to access these domains' registries and get the domains under their control so they can never be used again.[12]

**B. Ferrer Shut Down Backpage's Global Payments Network and Directed At Least $215 Million to the U.S. Government**

[redacted]

[12] *See* Ex. 11.

**a. Crypto Assets**

In addition to shutting down the website, Ferrer also provided significant assistance to the Government in recovering Backpage's financial assets. [redacted]

**b. Offshore Banks**

Crypto was only the tip of the iceberg. After Visa and Mastercard cut off Backpage's access to credit card processing in June 2015, Backpage created a vast network of European bank accounts, many held through shell companies with names created to disguise their relationship to Backpage. Ferrer provided the Government a complete list of these accounts, including bank names, addresses, account numbers, entities, currencies, and the amount of funds in each account.[17] [redacted]

[13] *See* Exs. 2, 12.
[14] *See* Ex. 13.
[15] *See* Ex. 14.
[16] *See* Ex. 15.
[redacted]

Backpage funds to the U.S. Government. The Government obtained $1,597,354 from ING Bank in the Netherlands[18] and $216,418 from Crypto Capital in Panama.[19]

[redacted]

**c. "Partner" Companies**

Backpage also had informal relationships with several "partner" companies. These "partners" operated clones of the Backpage website in various countries, and Backpage agreed to incorporate ads from their sites onto its U.S. website.[21] [redacted]

[redacted]

**d. Gift Cards and Other Alternative Payment Methods**

Ferrer also shed light on several of Backpage's most obscure financial assets, which the Company employed in its final years as it lost access to mainstream credit card companies and banks. [redacted]

---

[redacted]



**e. Backpage's Business Assets**

Ferrer also helped the Government recover millions of dollars that Backpage had prepaid to vendors, including software developers, datacenters, and a staffing agency to pay its employees.

## C. Ferrer Revealed Backpage's Global Marketing and Content Creation Operation, Providing the Government's Prosecution Case

[24] *See* Ex. 23.
[25] *See* Ex. 24.
[26] *See* Ex. 25.
[27] *See* Ex. 26.
[28] *See* Ex. 27.
[29] *See* Ex. 28.

Through his extensive cooperation, Ferrer shed light on Backpage's decade-long marketing effort to promote prostitution advertising on its website. Contrary to the Company's frequent claims that it was a mere publisher of third-party content and was therefore shielded by norms protecting content moderation, Ferrer explained to the Government that the Company specifically targeted prostitutes and encouraged them to post ads on Backpage. This, in turn, attracted a critical mass of "Johns," or prostitution clientele, to the website, and the prostitution pages on the site quickly became self-sustaining. The Government used this information provided by Ferrer as the central basis for its superseding indictment on July 25, 2018.

In his initial proffer session on April 5, 2018, Ferrer explained how he and Dan Hyer, at the direction of the Backpage owners, helped develop a marking plan in 2004 called the "Dallas Plan." ECF No. 1791 at 18:1. Under this plan, Backpage's marketing employees would reach out to prostitutes who advertised themselves on other websites to offer free ads on Backpage, with the expectation that some percentage of them would later become paying users on the site. ECF No. 1791 at 18:1–9. Ferrer explained how Backpage employees would often play a direct role in creating prostitution ads for customers by doing things such as writing proposed headlines for ads or selecting a photo to be highlighted in the ad itself. ECF No. 1786 at 3–17. Ferrer explained how variants of this "Dallas Plan" were used by Backpage to promote prostitution in the United States from 2004–2010, when Craigslist dropped its adult section and Backpage's prostitution advertising exploded.

Ferrer was also instructed by his superiors to pursue partnerships with prostitution marketing businesses. Shortly after Larkin and Lacey purchased the Village Voice newspaper in New York in early 2006, they instructed Ferrer to meet with the owners of prostitution-related businesses in New York. Ferrer held meetings with one of Backpage's largest customers, an agency called "Somad," which made millions of dollars by creating prostitution ads and placing them on websites like Backpage and Craigslist. *Id.* at 41:8–25, 42:1–2, 9–23. Ferrer also met with William Mersey ("Dollar

Bill"), who ran a service that created ads for prostitutes and was responsible for placing thousands of ads on Backpage. *Id.* at 44:19–25, 45:1–3. In these meetings, Ferrer negotiated preferential pricing with these "Super Posters," ensuring that they would continue posting prostitution ads on Backpage.

Ferrer also told the Government about the critical role that an explicit prostitution review site titled "The Erotic Review" ("TER") played in positioning Backpage as the premier prostitution advertising site in the United States. TER played a critical role in the U.S. prostitution market, serving as a website where Johns could leave explicit reviews about their experiences with individual prostitutes. ECF No. 1786 at 7:15–25, 8:1–6. In 2007, Ferrer, Spear, and Larkin developed a plan to reach out to TER about a "reciprocal links" proposal, whereby TER would include links to a prostitute's ads on Backpage if Backpage would include links to a prostitute's TER page. *Id.* at 32:22–25, 33:1–7. TER agreed in August 2007, leading to an increase of a million visits from TER to Backpage every month. ECF No. 1791 at 22:16–24.

Ferrer explained how Larkin and Spear sent him to Los Angeles to meet with the founder of TER, David Elms. *Id.* at 37:2–20. In that meeting, Ferrer signed an agreement where Backpage would pay TER $4,000 per month in exchange for TER increasing more referral traffic to Backpage. ECF No. 1786 at 35:13–24. Backpage and TER also agreed to exchange banner ads on each other's websites, and Ferrer agreed to provide technical assistance to TER in speeding up its website and tackling other technical problems. *Id.* at 36:2–6.

## III. Ferrer's Background

Carl Ferrer comes from humble origins. He was raised in Neillsville, a small farming town in rural Wisconsin. His early life was shaped by hardship and resilience. His mother had fled an abusive relationship and brought Carl and his siblings to a safer life away from their father. She later met Carl's stepfather, and together they raised a large, blended family. The family home had no indoor plumbing for years until Ferrer and his brother helped their stepfather install it. With five children at the time and only

two bedrooms, Carl and his brothers used the uninsulated attic as a bedroom until they were able to help their stepfather install an addition.[30]

During his youth, Ferrer worked with his stepbrother and stepfather for the family business, a construction company that specialized in roofing older barns and other buildings for dairy farmers. The work was from dawn to dusk, physically hard and with significant risk. Ferrer and his stepbrother operated without safety harnesses, nail guns, and scaffolding. At times, struggling farmers would exchange dairy or beef cattle for work. His work later expanded to include hot tar roofs for commercial flat top buildings. In the winter months, Ferrer and his stepbrother would clean chimneys.

In 1984, Carl became the first in his family to graduate from college. He graduated from the University of Wisconsin-Stevens Point with a degree in English and Communications. While in school, Carl volunteered to fight forest fires in Northern Wisconsin. He later spent 9 years serving in the Wisconsin Army National Guard, rising to the rank of Sergeant.[31] When a tornado ripped through parts of Wisconsin, he did not wait to be called up—he volunteered to protect those in need.[32] His primary duties included search and recovery, traffic control, and working directly with law enforcement to maintain public safety and prevent looting. That same sense of civic responsibility led Mr. Ferrer to run for local office. From 1991 to 1994, he served as a city councilmember in Stevens Point, Wisconsin.[33]

Mr. Ferrer began his career in advertising sales and steadily climbed the ranks to become general manager of several daily and weekly newspapers. In 1996, he was hired by Jim Larkin in an advertising sales manager role at New Times Media (later Village Voice Media). He was promoted to the corporate staff in Phoenix and, in 2003, was tasked with developing a classified ad website that would eventually become Backpage.com—a direct response to the emerging dominance of Craigslist.

---

[30] *See* Ex. 29.
[31] *See* Ex. 30.
[32] *See* Ex. 31.
[33] *See* Ex. 32.

Since the closure of Backpage in 2018, Mr. Ferrer has faced significant health challenges. In 2017, he underwent a partial kidney removal due to a tumor. A year later, doctors discovered and removed a brain tumor as part of treatment for Acromegaly, a rare endocrine disorder that affects both the body and mind.[34] He also suffers from significant hearing loss, a condition rooted both in childhood trauma and prolonged exposure to artillery blasts during his military service.

Mr. Ferrer is now in his mid-60s. He has accepted responsibility for his crimes and worked to assist the government to the greatest extent possible. Mr. Ferrer has spent more than seven years assisting the Government in shutting down Backpage, securing the convictions of its founders, and recovering more than $215 million to assist victims.

## IV. Motion for a Downward Departure

[redacted]

[34] Symptoms of the disease include sleep apnea, high blood pressure, cardiomegaly (enlarged heart), anxiety, apathy, depression, and cognitive and emotional changes. Acromegaly develops very slowly—so most people have symptoms five to ten years before they are diagnosed.

[redacted]

## V. CONCLUSION

For the foregoing reasons, Mr. Ferrer requests this Court to adopt the recommendation of the U.S. Attorneys' Office [redacted].

Dated: August 26, 2025

Respectfully submitted,

*/s/ Jonathan M. Baum*
Jonathan M. Baum
Joy L. Holden
HWG LLP
Attorneys for Defendant CARL FERR